**In the United States District Court**
**Western District of Arkansas**
**Hot Springs Division**

| | |
|---|---|
| National Park College | Plaintiff |
| v.    № 6:20-cv-6032-RTD | |
| Unit4 Education Solutions, Inc. | Defendant |

## Complaint

National Park College (the "College") for its Complaint against Unit4 Education Solutions, Inc., states:

## Parties

1. National Park College is a community college located in Hot Springs, Arkansas and organized under the laws of the state of Arkansas.

2. Unit4 Education Solutions, Inc. ("Unit4") is a technology vendor based in the St. Louis, Missouri area. It may be served through its registered agent, C T Corporation System, at 120 South Central Avenue, Clayton, Missouri 63105. It may also be served through its President, Andrew Brockhoff, at 14567 North Outer 40 Road, Chesterfield, Missouri 63017.

## Jurisdiction

3. This Court has subject matter jurisdiction under 28 U.S.C. § 1332(a)(1). The College is a citizen of Arkansas. On information and belief, Unit4 is not incorporated in Arkansas and does not have its principal place of business in Arkansas. On information and belief, Unit4 has its principal place of business in either Missouri or Massachusetts. At least $700,000 is in controversy. That is

the minimum amount of damages (or the value of the restitutionary relief) the College seeks as a result of Unit4's violation of the parties' contract and its other liabilities as detailed in this Complaint.

4. Unit4 is subject to personal jurisdiction in Arkansas because the parties' contract provides for exclusive jurisdiction in Arkansas. Unit4 is also subject to personal jurisdiction in Arkansas because this case arises out of or relates to actions that Unit4 took in Arkansas, including contracting with an Arkansas college, making multiple trips to Arkansas in connection with that contract, and performing work in Arkansas under that contract, albeit work that did not meet contractual standards and is of little or no value. The contract is governed by Arkansas law and specifies in part that the project "will take place at the National Park College campus in Hot Springs, Arkansas."

## Venue

5. Venue lies in this Court under 28 U.S.C. § 1391(b)(2). A substantial part of the events or omissions giving rise to this case occurred in, and a substantial part of the property that is the subject of this case is situated in, this district. Unit4 entered into and violated a contract with the College in Garland County, Arkansas. Garland County is in this Court's Hot Springs Division. *See* 28 U.S.C. § 83(b)(6).

**Facts**

    A.    **Overview of the contract.**

    6.    Unit4 entered into a contract with the College with an effective date of June 16, 2017. The contract, along with applicable state-approval riders, is known to Unit4.[1]

    7.    The purpose of the contract was for Unit4 to implement a Enterprise Resource Planning, or "ERP," system for the College.

    8.    The ERP system had two main components.

    9.    One program, called the "Student Management" software, would be a student-focused program to handle admissions, registration, financial aid, and other operational tasks on the student side.

    10.    The other program, called the "Business World" software, would be a back-office program to handle accounting, human-resources, and other operational tasks on the business side.

    11.    The College intended to transition from a "legacy" system called PeopleSoft, in which information was largely stored on local servers that were expensive to maintain and increasingly obsolete, to an entirely cloud-based system that could be accessed online and therefore used on mobile devices.

    12.    The "objectives and scope" section of the state-approval rider stated that the "[s]ervices are web based and includes data storage." It also stated that "[t]he new ERP system will provide the [College] with higher business functionality to provide better service to the students and community."

---

[1] The contract contains a confidentiality clause that is of doubtful enforceability. Nevertheless, out of an abundance of caution, the College is not attaching the contract at this time, so that the parties can confer about this issue and address it to the Court if necessary.

13. These two software programs were not cheap. The software licenses alone were $390,964 per year. The "implementation services," meaning all the things that went with the installation, were stated at $1,035,886.50.

14. Yet the College asked the state of Arkansas to approve this expenditure because, if successful, it would enable the College to better serve its students and employees with both back-office and student-facing applications.

### B. The importance of having both Business World and Student Management work as a synchronous whole.

15. The College would not have purchased Business World without Student Management, and it would not have purchased Student Management without Business World.

16. The College desired the full complement of services that it understood would be provided by Business World and Student Management together.

17. But the College did not just need both programs as an eventual goal—it also needed both programs to be implemented together.

18. The importance of having both programs functional at the same time drove the implementation timing as discussed below. In particular, the readiness of Student Management drove the implementation date of Business World, because implementing Business World without Student Management would have required the College to expend additional resources on developing an interface (that is, a bridge) between PeopleSoft Campus Solutions (the College's then-existing program) and Business World.

### C. The initial term and the importance of the go-live date.

19. The initial term of the agreement was for roughly one year, from June 17, 2017 through June 30, 2018.

20. The reason for the one-year initial term was that the parties expected a "go-live" date of July 1, 2018, meaning that both the Business World and Student Management programs would be fully operational and available for use by the College on that date.

21. Unit4 knew well before the contract was signed that a go-live date in summer 2018 was a key part of the parties' plan.

22. It was important to the College for the go-live date to be as early as possible because, in the meantime, the College had to continue paying the costs associated with the PeopleSoft system while at the same time paying the costs for the installation of the Unit4 programs, including Unit4 software licenses that cost hundreds of thousands of dollars per year.

D. **The importance of a fully cloud-based system.**

23. In a September 12, 2017 press release announcing the contract, Unit4 pledged that "Unit4 Student Management will provide [the College] with the tools [that] faculty and advisors need to promote success."

24. An important feature of the "tools" sold by Unit4 was a mobile, completely cloud-based platform. Unit4 knew this was an essential part of the agreement. In the same September 12, 2017 press release, the Global Head of Higher Education at Unit4 stated that "[w]e are looking forward to helping National Park College modernize their student experience with a mobile and data-driven solution." The press release acknowledged that "[the College] chose Unit4 for its mobile friendly platform and responsive design, as well as for the flexibility and ease of use when implementing configurable solutions."

25. And just like the importance of the go-live date, Unit4 knew well before the contract was signed that a fully cloud-based product—for both

Student Management and Business World—was the primary selling point for the College.

26. In a presentation at the College before the contract was signed, Unit4 made certain representations to the College about Student Management.

27. The presentation was recorded on video. During the presentation, a Unit4 rep told the College that Student Management was a "brand new product" that was "being released, generally available in North America" at the end of that month. But to reassure the College that this "from scratch" product would be reliable, Unit4 reiterated that Student Management was its "seventh-generation system." The rep was clear about what this meant to the College: "our version 1 of our product is a very mature solution, and it's also much more comprehensive."

28. The presentation focused heavily on the cloud-based nature of Student Management. The College was told that the product was "designed day-one to support the new technology—it is a true cloud product." A PowerPoint slide that was displayed during this statement noted that one of the "Cloud" features was "No IT infrastructure." The same slide, under the "Mobility" heading, proclaimed that the product "Runs on any device." The rep told the College that users of the program, including the College, would not be "tied to your desk—you can work with the students where they are, when you need it."

29. Later in the presentation, the Unit4 rep asked the group if they were "ready to see some live software," and proceeded to enter a demonstration. At the top of the demo page was the heading "U4SM – Cloud Portal – iPhone Portrait," which suggested to the College that the demonstration was evidencing a fully cloud-based functionality.

30. As the presentation wrapped up, Unit4 reaffirmed some of the "key concepts." The first ones the rep listed were: "cloud-based solution, it's mobile, very comprehensive."

31. Because some of the College personnel in attendance were not in the IT field, someone asked Unit4 to "speak a little bit about how this is a cloud-based solution and not a hosted solution." The rep did so. He said that "all you have to worry about is basically having internet access." He also touted the fact that Unit4 was a 4,000-employee company operating across 26 countries, "so we have a global cloud operation." And he noted that the cloud-based nature of Unit4's program "allows us to speed innovation," versus the College's then-current system, in which "upgrades are probably a big process, it's a major undertaking, probably only happen once every year, or two years, and then with [Unit4] we're doing continuous updates to the system."

32. Just as with Student Management, the College was led by Unit4 to believe and understand that Business World would also be fully cloud-based.

### E.   Unit4's failure to provide the College with the products it sold.

33. But there was a problem with Unit4's sales strategy. It later became apparent that the cloud-based programs Unit4 sold to the College did not exist when Unit4 sold them, could not feasibly be developed within the time Unit4 led the College to believe, and in fact were never developed in that time or even during multiple forced extensions. Unit4's actions in selling the project under a July 1, 2018 go-live for both programs was, at a minimum, deceptive.

34. The first domino was Student Management. Soon after the implementation teams for the project started to be assembled, Unit4 suggested that January 2019, rather than July 2018, would be a more feasible go-live date for Student Management.

35. The next domino was Business World. In March 2018, conditions were such that the College's Chief Information Officer was "getting worried" about whether the July 1, 2018 go-live date for Business World would be met. (Unlike Student Management, Business World was an older product that should have been ready for implementation as a cloud-based product more quickly than Student Management.) At that time, however, Unit4 did not dispute or express disagreement with the College's understanding of what the go-live date for Business World would be.

36. The CIO's worries were well founded. In April or May 2018, Unit4 advised the College to delay the go-live date on Business World to January 2019. Besides the fact that such a delay exacerbated the growing need to transition from the legacy system on which the College was still operating, a January 2019 go-live date posed an additional problem. It required a mid-year conversion for the College's business office, which would be a major headache. Meanwhile, the College had paid almost $400,000 for software licenses that still had no product to be used with.

37. In July 2018, in response to the College's inquiry into licensing fees invoiced for 2018 (which, again, were not supporting any usable product), Unit4's North American President apologized for the delays Unit4 had caused, and said that he looked forward to putting this issue in the rear-view mirror and getting the College "into production."

38. Later in July 2018, Unit4 proposed a multi-option three-component resolution "for the project delays experienced by [the College] and caused by Unit4."

39. Somewhere along the way, the go-live date for Student Management and Business World had to be pushed from January 2019 to July 2019.

40. In November 2018, a Senior Project Manager for Unit4 wrote to say that the company was "finalizing our analysis of some open issues and solidifying some roadmap changes." The upshot was that July 2019, the twice-delayed go-live date for Student Management, was "not possible." The software had issues with at least two features—billing and permissions—that Unit4 acknowledged were "important to [the College]." The software version in which these issues were present, and which was therefore "not a viable release to deploy into production," was Version 18.4. This is remarkable given that the College had been told in the Unit4 sales presentation that "our version 1 of our product is a very mature solution, and it's also much more comprehensive."

41. Early in 2019, the College expressed an interest in having a conversation about ending its relationship with Unit 4 as painlessly as possible, noting that it still did not have any use of the products it had purchased.

42. Things got worse in February 2019. Unit4 reiterated that a July 2019 go-live for Student Management was no longer an option—not unless the College was content with only partial functionality and "interim interfaces with legacy systems to accommodate this option." If the College wanted the full set of products—both Business World and Student Management—that it had purchased for nearly $1.5 million back in 2017, it would have to wait until December 2019. On top of that, the products that would be available in December 2019 would not be fully cloud-based as they were sold to the College, and on which the College had insisted all along.

43. The President of the College wrote to Unit4 in February 2019 to set out the College's position on the continually delayed implementation of the products. The College proposed that Unit4 refund the $721,401.98 that the College had already spent on the products it still had not received, and that Unit4 cancel roughly $105,000 in outstanding invoices for those products. In exchange, the College agreed that it would review Unit4's software once it was fully developed, and would consider negotiating a new contract at that time. In March 2019, Unit4 refused this offer.

44. After further communications with Unit4 in April 2019, the College told Unit4 in July 2019 that Unit4's services were no longer required. The College again asked for a return of the extensive sums it had paid toward the failed project.

45. In August 2019, Unit4 refused to refund the College's money. Instead, Unit4 continued its pattern of offering half-solutions. This time the offer was to "complete implementation" of Business World (which still had not been implemented), and cancel the implementation of Student Management. This proposal was not acceptable to the College.

46. The College now seeks damages or, in the alternative, equitable remedies, for the harm caused by Unit4's failure to provide the products it sold.

47. In addition to the monies paid to Unit4 for products that were never delivered, the College has been forced to expend additional sums propping up its legacy PeopleSoft system as a result of Unit4's actions.

48. On information and belief, other schools have had similar experiences with Unit4 failing to deliver the products it sold.

### Count I — Breach of Contract

49. The allegations in the above paragraphs of this Complaint are incorporated herein by reference.

50. Unit4 and the College had a valid and binding contract for the implementation of Student Management and Business World.

51. Unit4 had a contractual obligation to, among other things, provide fully cloud-based Student Management and Business World programs for the College's use.

52. Unit4 had a contractual obligation to provide the Student Management and Business World programs within certain time parameters.

53. Unit4 failed to do this. This failure to do what the contract required is a material breach of the contract.

54. As a result of Unit4's breach of contract, the College has been damaged in the amount of at least $700,000.

55. The College seeks to recover its damages from Unit4.

56. In the alternative to damages, the College seeks rescission of the contract and restitution and recovery back of the money it paid. The College is not holding any benefit that it received from Unit4 under the contract.

### Count II — Constructive Fraud (Affirmative Statements)

57. The allegations in the above paragraphs of this Complaint are incorporated herein by reference.

58. Unit4 made false statements about the capabilities of Student Management and Business World, and about the feasibility of implementing those programs within a certain timeframe. Those statements include, but are not limited to, the ones pleaded above.

59. The capabilities of the programs, and the feasibility of implementing them within a certain timeframe, were material to the College, and Unit4 knew that.

60. On information belief, Unit4 either knew that its statements were false, or knew that there was insufficient evidence upon which to make those statements.

61. On information belief, even if Unit4 did not intend to deceive, it nevertheless intended for the College to act in reliance on the statements.

62. The College justifiably relied on Unit4's statements.

63. The College was damaged in the amount of at least $700,000 by its reliance on Unit4's statements.

64. The College seeks to recover its damages from Unit4.

65. In the alternative to damages, the College seeks rescission of the contract based on Unit4's constructive fraud, and seeks restitution and recovery back of the money the College paid.

### Count III — Constructive Fraud (Nondisclosure)

66. The allegations in the above paragraphs of this Complaint are incorporated herein by reference.

67. Unit4 failed to disclose material facts about the limitations on the capabilities of Student Management and Business World, and about the limitations on Unit4's ability to implement those programs within a certain timeframe.

68. The College's relationship with Unit4 was such that Unit4 had a duty to disclose those material facts. This relationship arose from Unit4's knowledge that the College had a particular need for, and insistence on, certain

capabilities in Student Management and Business World, and on having those programs be fully functional within a certain timeframe.

69. Despite knowing of the College's stated need, and despite knowing of the College's reliance on Unit4 to meet its stated expectations, Unit4 failed to disclose material information that contradicted or undermined the possibility of those expectations being met.

70. On information belief, even if Unit4 did not intend to deceive, it nevertheless intended the College to act in reliance on Unit4's failure to disclose material facts.

71. The College justifiably relied on Unit4's failure to disclose.

72. The College was damaged in the amount of at least $700,000 by its reliance on Unit4's failure to disclose.

73. The College seeks to recover its damages from Unit4.

74. In the alternative to damages, the College seeks rescission of the contract based on Unit4's constructive fraud, and seeks restitution and recovery back of the money the College paid.

### Count IV — Arkansas Deceptive Trade Practices Act

75. The allegations in the above paragraphs of this Complaint are incorporated herein by reference.

76. The Arkansas Deceptive Trade Practices Act (the "Act") prohibits deceptive and unconscionable trade practices, including engaging in any unconscionable, false, or deceptive act or practice in business, commerce, or trade. Ark. Code Ann. § 4-88-107(a)(10).

77. The Act also prohibits using any deception or false pretense in connection with the sale of any goods or services, as well as omitting any

material fact (with the intent that others rely on the omission) in connection with the sale of goods or services. Ark. Code Ann. § 4-88-108(a)(1).

78. The Act authorizes anyone who has been harmed by a deceptive trade practice to bring a civil action against the wrongdoer. Ark. Code Ann. § 4-88-113(f). The injured party is also entitled to seek its attorneys' fees. *Id*.

79. As pleaded above, Unit4 made false statements about, and created false pretenses surrounding, the capabilities of Student Management and Business World, and about the feasibility of implementing those programs within a certain timeframe. Unit 4 also omitted material facts about the programs' capabilities and the feasibility of implementing them within a certain timeframe. On information and belief, Unit4 did so with the intent that the College rely on the omission.

80. Unit4's actions in violation of the Act have proximately caused the College actual financial loss.

81. The College was damaged in the amount of at least $700,000 by Unit4's violations.

82. The College seeks its damages caused by Unit4's violations.

### Count V — Unjust Enrichment

83. The allegations in the above paragraphs of this Complaint are incorporated herein by reference.

84. Unit4 has received something of value—the funds the College has paid to Unit4 for programs it did not receive—to which Unit4 is not entitled and which Unit4 must restore to the College.

85. Unit4's enrichment is unjust and compensable. Unit4 received hundreds of thousands of dollars for two products that it never provided.

86. Unit4 has therefore received money or its equivalent under circumstances in which, in equity and good conscience, it ought not to retain them.

## Attorneys' Fees

87. The College seeks its attorneys' fees under Ark. Code Ann. § 16-22-308, Ark. Code Ann. § 4-88-113(f), and as otherwise allowed by contract or law.

## Jury Demand

88. The College respectfully demands a 12-person jury in any trial of this case on the issues so triable.

## Conclusion

For the reasons stated above, the College respectfully asks that the Court enter judgment for the College as follows:

a. against Unit4 for (1) an amount to be determined at trial, but at least $700,000; (2) costs; and (3) attorneys' fees; and

b. for all other relief, at law or in equity, to which the College is entitled.

*Respectfully submitted,*

*/s/ Jamie Huffman Jones*
Jamie Huffman Jones (2003125)
Joshua C. Ashley (2012051)
FRIDAY, ELDREDGE & CLARK, LLP
400 W. Capitol Ave., Ste. 2000
Little Rock, Arkansas 72201-3522
501.376.2011 – *phone*
501.376.2147 – *fax*
*jjones@fridayfirm.com*
*jashley@fridayfirm.com*

*Attorneys for National Park College*